Filed 8/20/14  P. v. Wilson CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065468 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1101914) |
| BRANDON RAMSEY WILSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Richard T. Fields, Judge.  Affirmed.

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne McGinnis and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

Brandon Ramsey Wilson appeals a judgment following his jury conviction of first degree murder (Pen. Code, § 187, subd. (a)).[1] On appeal, he contends: (1) the evidence is insufficient to support the jury's finding that the murder was premeditated and deliberate; and (2) the prosecutor committed prejudicial misconduct during closing arguments.

FACTUAL AND PROCEDURAL BACKGROUND

In 2011, Wilson was living in a three-bedroom apartment in Moreno Valley with his girlfriend, Renisha Bruins, her four-year-old son, and her cousin, Shukeem Beard. Wilson and Bruins shared the master bedroom. Bruins told her friend, Tori Clark, about an argument she had with Wilson during which she elbowed him and said she wanted to leave, but he would not let her leave. Wilson grabbed her and she fell and hit her head. Wilson and Bruins were planning to get married.

On the afternoon of March 26, 2011, Wilson went to Palm Springs with Bruins, her brother, her grandfather, and Clark. While at a casino, Bruins became irritated at Wilson because he was drunk and acting silly, but she ignored him. After Wilson calmed down, Bruins was in a happy mood again.

Shortly before 9:00 p.m., Wilson was dropped off at their apartment and Bruins went with Clark to a friend's house for a "girls night." At about 9:00 p.m., Beard arrived home to prepare for work and saw Wilson sleeping on the couch. At about 1:00 a.m. to

_____

[1] All statutory references are to the Penal Code.

2

2:00 a.m., Beard came home during a work break and saw Wilson still asleep on the couch. Without speaking to Wilson, Beard returned to work.

While at her friend's house, Bruins was in a good mood and drinking alcohol. She spoke positively about Wilson and was video recorded saying, "I love you, Brandon." At about 2:30 a.m. to 3:00 a.m., Bruins and Clark left their friend's house and Bruins was dropped off at her apartment.

At about 3:00 a.m. or 3:30 a.m., Rosalba Negrete, a neighbor who lived below Bruins and Wilson's apartment, was awakened by loud thumping noises emanating from the apartment above. She heard thumping noises intermittently over a period of about one hour. She also heard yelling and a loud female voice saying, "No," "Stop," and "Go."

At about 4:00 a.m. to 4:15 a.m., another neighbor, Jonell Hughes, arrived home after work and heard thumping sounds as she approached the building's outside stairwell. When she reached the second flight of stairs, she heard loud voices of a man and a woman coming from apartment 3017 (i.e., Bruins and Wilson's apartment). When she reached the third flight of stairs, she heard a woman say, "Get off of me," and a man repeatedly saying, "Shut up." When she reached the third floor landing, she smoked a cigarette, but did not hear anything more. She entered her apartment and went to bed at about 5:00 a.m.

At about 5:00 a.m., Wilson called his mother and apparently told her he had stabbed Bruins. She told him to turn himself in. She called his father, who then called Wilson. Wilson told his father he was in Rialto, about 30 minutes away, and said he was on his way to Ontario. Wilson was crying and distraught. His father talked Wilson into

3

coming back and turning himself in.  They agreed to meet at a restaurant in Moreno Valley.

At about 9:00 a.m., Wilson met his parents and cousin, Robert Turner, at the restaurant.  When they went to the police station, it was not open to the public on that Sunday morning so they went to see their minister.  They later returned to the station and contacted a police officer in the parking lot who helped them enter the station.

At 10:47 a.m., Corporal Brian Wolfe let Wilson, his parents, and his cousin into the police station.  Wilson told him "he had an accident between him and his girlfriend" and that "it may be serious."  Wolfe sent Deputy Matthew Reilly to check on Bruins.  Wilson told Wolfe that Bruins was angry with him and came toward him with a kitchen knife.  She attacked him, they struggled, and he took the knife from her, cutting his hand in the process, and then stabbed her "a few times."  Wilson was arrested and gave police more information during a subsequent interview.

When Reilly arrived at the apartment, Beard led him to the master bedroom.  Reilly found Bruins's dead body on the bed wrapped in sheets and a blanket.  There was blood on her face and on the blanket, headboard, ceiling, carpet, and all four walls.  A subsequent investigation found a 12-inch knife with a seven-inch blade in the kitchen sink.  An odor of bleach emanated from the sink and the water trapped in the sink contained a mixture of blood and bleach.  Investigators determined that Bruins likely was moving around during the attack and was stabbed at different locations in the bedroom.

Dr. Christopher Happy performed an autopsy and found Bruins had been stabbed a total of 13 times.  She was stabbed in the neck, four times in the upper extremities, and

4

eight times in the torso, including once in her upper back. She also had defensive injuries, including scratches and bruises. Happy believed the knife found in the kitchen sink was consistent with the one used to kill Bruins. Her death was caused by stab wounds to her neck and torso. He concluded she likely was alive "minutes or at least seconds" after sustaining those wounds.

An information charged Wilson with one count of murder (§ 187, subd. (a)) and alleged he committed the murder by using a knife (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)). It also alleged he had one prior strike conviction (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)), two prior prison terms (§ 667.5, subd. (b)), and a prior serious felony conviction (§ 667, subd. (a)). At trial, the prosecution presented evidence substantially as described above. The parties stipulated that Bruins had a blood alcohol content in excess of 0.12 percent. In his defense, Wilson presented the testimony of a former girlfriend who said that he never lost his temper and was never violent toward her. He also presented the expert testimony of Dr. Francisco Gomez, a clinical neuropsychologist, who testified Wilson had a cognitive disorder that could make it difficult for him to develop strategies to solve problems. In unexpected or stressful situations, persons with that disorder act more impulsively and overreact to the situation. Afterward, those persons would feel guilt and remorse. On cross-examination, Gomez admitted he had not reviewed the police reports from Wilson's previous robbery and fraud convictions to determine whether Wilson had acted impulsively in those situations and had not planned those crimes. Wilson had not reported to him any impulse-control problems he had experienced in the past. Wilson also presented the testimony of a

5

forensic toxicologist who testified that alcohol can make a person more aggressive and violent. However, there was no way to tell how Bruins was affected by alcohol. Alcohol slows a person's reaction time and adversely affects a person's balance and coordination.

The jury found Wilson guilty of first degree murder and found true the knife use allegation. He admitted all of the prior conviction allegations. The trial court sentenced him to a total term of 55 years to life in prison. Wilson timely filed a notice of appeal.

DISCUSSION

I

*Substantial Evidence to Support Wilson's First Degree Murder Conviction*

Wilson contends the evidence is insufficient to support the jury's finding the murder was premeditated and deliberate and therefore his conviction of first degree murder must be reversed.

A

When a defendant challenges his or her conviction for insufficient evidence on appeal, we apply the substantial evidence standard of review. "Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence*--that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261, italics added in *Cuevas*.) We "must presume in support of the judgment the existence of

6

every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) Furthermore, "[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*Ibid*.) "The standard of review is the same in cases in which the People rely mainly on circumstantial evidence." (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)

B

Section 189 defines first degree murder as all "willful, deliberate, and premeditated killing." However, to prove deliberation and premeditation, "it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (§ 189.) *People v. Koontz* (2002) 27 Cal.4th 1041, at page 1080, stated: "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." Alternatively stated, " 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.) *Mayfield* further stated: "The process of premeditation and deliberation does not require any extended period of time. 'The true

7

test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*Ibid.*) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) However, "[i]t is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation." (*People v. Anderson* (1968) 70 Cal.2d 15, 24.) The question of "how long a thought must be pondered before it can be said to be premeditated and deliberated" (*People v. Bender* (1945) 27 Cal.2d 164, 184) is "fundamentally a question of fact for the jury in each case under proper instructions." (*Ibid.*)

In *People v. Anderson, supra,* 70 Cal.2d 15, the California Supreme Court set forth certain types of evidence reviewing courts should consider in determining whether there is substantial evidence to support findings of premeditation and deliberation for first degree murder, stating:

> "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing--what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing

8

from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id*. at pp. 26-27.)

However, the *Anderson* factors, although "helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Koontz, supra*, 27 Cal.4th at p. 1081.) *Anderson* merely cataloged common factors that had occurred in prior cases and its factors "do not represent an exhaustive list of evidence that could sustain a finding of premeditation and deliberation, and the reviewing court need not accord them any particular weight." (*People v. Young* (2005) 34 Cal.4th 1149, 1183.)

C

Based on our review of the whole record, we conclude there is substantial evidence to support the jury's finding that Wilson's murder of Bruins was premeditated and deliberate. The jury could reasonably infer from the testimony of the two neighbors that Wilson and Bruins physically struggled over a period of about one hour. The neighbors heard intermittent thumping noises. One neighbor heard a woman (presumably Bruins) yell, "No," "Stop," and "Go." Another neighbor heard a woman (presumably Bruins) yell, "Get off of me," and a man (presumably Wilson) repeatedly say, "Shut up." Bruins was stabbed a total of 13 times, including once in the back, with a kitchen knife. The jury could reasonably infer from the evidence that Wilson went to the kitchen to get that knife, returned to the bedroom, and then used the knife to repeatedly stab Bruins as she moved defensively around the bedroom. It could also infer Wilson showed a

9

consciousness of guilt when he attempted to cover up his crime by wrapping Bruins's body in sheets and a blanket and washing off the knife with bleach in the kitchen sink and thereafter fleeing the scene of the crime.

The evidence supports an inference that Wilson went to the kitchen to obtain the knife and then returned to the bedroom to viciously attack Bruins, thereby supporting the additional inference that he planned the attack and deliberately murdered her with premeditation. (Cf. *People v. Perez* (1992) 2 Cal.4th 1117, 1126 [planning activity was shown by defendant's obtaining knife from kitchen before attacking the victim with it].) Those inferences discredit Wilson's claims that Bruins attacked him with the knife and/or that he acted impulsively when he stabbed her. Likewise, the jury could reasonably disregard, as not credible or persuasive, Gomez's uncontradicted expert testimony regarding Wilson's cognitive impairment and probable impulsive behavior.

The evidence showing the manner of the killing also supported a reasonable inference that Wilson killed Bruin with premeditation and deliberation. "[T]he method of killing alone can sometimes support a conclusion that the evidence sufficed for a finding of premeditated, deliberate murder." (*People v. Memro* (1995) 11 Cal.4th 786, 863-864; see also *People v. Perez, supra*, 2 Cal.4th at p. 1127 [manner of killing was indicative of premeditation and deliberation].) Most of Bruins's stab wounds were to the left side of her torso, supporting a reasonable inference Wilson was aiming for her heart and therefore deliberately intending to kill her. The stab wound to her upper back supports a reasonable inference that Wilson stabbed Bruins as she tried to escape his attack and contradicted Wilson's version that Bruins attacked him with the knife. Finally, the

10

number of stab wounds, a total of 13, supports a reasonable inference that Wilson murdered Bruins with premeditation and deliberation and did *not* accidentally or impulsively stab her while defending against her attack on him. (Cf. *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 [jury could conclude defendant intended to kill victim based on "sheer number of wounds on [her] body, many of which individually would have been fatal"]; *People v. Pride* (1992) 3 Cal.4th 195, 247 ["A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation."].)

The absence of strong evidence of Wilson's motive in killing Bruins does not refute the jury's finding of premeditation and deliberation. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 202.) Although the prosecutor argued in closing that Wilson killed Bruins so he, as a parolee who had just committed another crime (e.g., assault), would not go back to prison, there is substantial evidence to support the jury's finding of premeditation and deliberation even if it did not believe the prosecutor's proffered motive for Wilson's killing of Bruins. The evidence discussed above showing Wilson's planning of the killing, the neighbors' testimony regarding the one-hour struggle, and the vicious manner in which he repeatedly stabbed Bruins over a period of time (as shown, in part, by the blood found throughout the bedroom), constitutes substantial evidence to support the jury's finding of premeditation and deliberation. (*People v. Perez, supra*, 2 Cal.4th at pp. 1129-1130 [defendant's planning conduct, together with manner of killing, supported jury's reasonable inference of premeditation and deliberation].) The jury could have reasonably inferred Wilson had an opportunity to reflect on his decision to kill Bruins

11

after she pleaded with him to stop and did so with careful thought and weighing of the considerations and did not kill her based on an unconsidered or rash impulse. (*People v. Stitely, supra*, 35 Cal.4th at p. 543; *People v. Mayfield, supra*, 14 Cal.4th at p. 767.) Wilson has not carried his burden on appeal to show the evidence is insufficient to support his conviction of first degree murder.

II

*Prosecutor's Closing Arguments*

Wilson contends the prosecutor committed prejudicial misconduct during closing arguments. He argues the prosecutor distorted the reasonable doubt burden of proof and improperly asked the jury to consider matters outside of the evidence.

A

Before the parties' closing arguments, the trial court instructed the jury on the reasonable doubt burden of proof, stating, "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true." During her closing arguments, the prosecutor extensively discussed the evidence showing Wilson's guilt of first degree murder. Wilson's counsel then presented her opposing closing arguments. In rebuttal, the prosecutor argued:

> "You know in order for you to find the defendant guilty of murder, whether you decide it's first or second [degree], you have to have an *abiding conviction of the truth*. You have to get up tomorrow and *know I gave* [Bruins] *justice*. I did the right thing. *Next week you'll know that you gave this family, you gave* [Bruins] *justice*." (Italics added.)

12

The trial court overruled Wilson's objection to that argument as improper.  The prosecutor then continued, stating:

> "*Justice*.  This is what it's all about.  The defendant has had his day in court.  He . . . has exercised his right to a trial.  That doesn't mean there's something wrong with this case.  *That abiding conviction*[] *will lead you in a year from now to say I did the right thing . . .* during that trial.
>
> "*This girl deserved justice*.  And that man deserves to be called what he is.  He's a cold-blooded murderer.  That's what he is.
>
> "And I ask you all to follow the evidence where it leads you.  Use your common sense and let him know that what he did to that woman was wrong.  And it's cold-blooded murder."  (Italics added.)

After the jury retired to begin deliberations, the trial court and counsel discussed the court's ruling on Wilson's objection to the prosecutor's closing argument regarding an abiding conviction of the truth and justice for Bruins and her family, as follows:

> "THE COURT:  You can't argue just one side justice.  That would be like saying you can't argue your side of justice before the evidence.
>
> "[Wilson's counsel]:  I believe it goes to justice for the victim but not for the family.  It's justice for the victim.  I don't believe it extends to the family.
>
> "THE COURT:  I think the justice is the People of the State of California, which includes the family. . . .  [B]oth sides are entitled to justice. . . .  It is certainly not improper for you to say give my client justice.  And I don't think it's improper for the People to say give [Bruins] justice.
>
> "It wasn't in the context of anything but in light of the evidence.  We had all of the argument regarding the evidence on the case, so it wasn't make up your own rules and convict the defendant.  It was he's guilty because of all of this argument he [sic] had regarding actual evidence.  All of these things.

13

"And after we had an hour, probably an hour and a half total of argument, then she says give them justice. Well, that's in light of all of the evidence. She didn't say ignore the evidence and convict him anyway. She said give them justice. I don't think it's improper for either side to say give my side justice. Give my side justice.

"In light of the evidence, I can't imagine it would be any more inappropriate for you to say give the defendant justice. And she says give my side justice. Give the family justice. I think if I were one of the family members, and I believed in light of all of the evidence . . . as a parent I'd want justice.

"If the evidence shows that my kid was killed unlawfully, why is it improper to say give the family justice in light of the evidence?

"It might be improper . . . to say we really can't prove it but convict him anyway, so they have some skewed sense of peace. But that didn't happen. The entire argument was in light of all the evidence.

"We had lengthy [arguments]. So, . . . in light of the fact the People believe they have shown, the evidence demonstrates the defendant's guilt beyond a reasonable doubt, in light of that fact give him justice. I just don't know what is wrong with that.

"I don't know what would be wrong with you saying the same thing. If you were arguing in light of the fact the People cannot prove the case beyond a reasonable doubt, please give my client justice.

"So that's the Court's view of it."

The jury returned a verdict finding Wilson guilty of first degree murder.

B

A defendant generally may not complain on appeal of prosecutorial misconduct unless he or she timely objected below on the same ground and requested the jury be admonished to disregard the impropriety. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Under the federal Constitution, a prosecutor commits misconduct when his or her behavior comprises a pattern of conduct so egregious that it infects the trial with such

14

unfairness as to make the conviction a denial of due process. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) If the prosecutor's conduct does not render a criminal trial fundamentally unfair under the federal standard, that conduct is prosecutorial misconduct under California law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Ochoa* (1998) 19 Cal.4th 353, 427.)

Although a prosecutor is given wide latitude in vigorously arguing the People's case, the prosecutor may not misstate the law. (*People v. Bell* (1989) 49 Cal.3d 502, 538 (*Bell*); *People v. Bandhauer* (1967) 66 Cal.2d 524, 529.) The prosecutor "has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the conclusions are illogical because these are matters for the jury to determine." (*People v. Thomas* (1992) 2 Cal.4th 489, 526.) "It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial. [Citations.] We recognize that the prosecutor 'may vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citations], but the bounds of vigorous argument do not permit appeals to sympathy or passion such as that presented here." (*People v. Fields* (1983) 35 Cal.3d 329, 362-363, fn. omitted.)

"[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.) Even if an error could not be cured by an

15

admonition to the jury, reversal of a defendant's conviction is warranted only if on the whole record the error resulted in a miscarriage of justice. (*Bell*, *supra*, 49 Cal.3d at p. 535.)

C

Wilson asserts the prosecutor's closing argument in rebuttal distorted the reasonable doubt burden of proof because she argued the jurors must have as an abiding conviction that Bruins's family was given justice rather than an abiding conviction of the truth. We disagree with the premise of Wilson's argument. Although the prosecutor referred to justice for Bruins and her family, she did *not* argue, either expressly or implicitly, that the abiding conviction aspect of the reasonable doubt burden of proof meant the jurors need only have an abiding conviction that Bruins's family was given justice. Although the prosecutor referred to the jurors' giving Bruins and her family "justice" and knowing they did the "right thing," her argument could not reasonably be interpreted as suggesting the jury could convict Wilson without proof of his guilt beyond a reasonable doubt.

Furthermore, before closing arguments the trial court instructed the jurors on the reasonable doubt burden of proof, stating that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true." In her closing argument, the prosecutor referred to that burden of proof, stating, "you have to have an abiding conviction of the truth." The fact that the prosecutor argued the jurors would then know they gave Bruins and her family justice did not lower that burden of proof. Rather, her argument explained that if the jurors properly applied the reasonable doubt

16

burden of proof, they would then know afterward (e.g., a week or year later) they gave Bruins and her family justice and did the right thing.

In any event, to the extent there was any ambiguity in the prosecutor's argument regarding the "abiding conviction" requirement, the trial court correctly instructed the jury with CALCRIM No. 220 on the reasonable doubt standard of proof and further instructed the jury that "[y]ou must follow the law as I explain it to you . . . . [and] [i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." There is no reasonable likelihood the jurors understood, or applied, the prosecutor's closing argument regarding the abiding conviction requirement in the manner Wilson asserts. The prosecutor did not err.

D

Wilson also asserts the prosecutor's closing argument improperly appealed to the passions of the jurors. He cites *People v. Vance* (2010) 188 Cal.App.4th 1182 (*Vance*), in which the court stated it is misconduct for a prosecutor to appeal to the passions of the jurors by asking them to imagine the suffering of the victim. (*Id*. at p. 1192.) *Vance* further stated:

> "It is equally established that it is misconduct for a prosecutor to argue that the jury in a noncapital case—or in the guilt phase of a capital case—should consider the impact of the crime on the victim's family. [Citations.] The justification for both of these exclusionary policies is that they deal with subjects that are inherently emotional, possessing an unusually potent power to sway juries, and that their use must therefore be rigidly confined and controlled . . . ." (*Vance*, *supra*, 188 Cal.App.4th at p. 1193.)

17

Wilson asserts that by arguing the jurors should consider justice for Bruins and her family, the prosecutor improperly argued the jurors should consider the impact of the crime on Bruins and her family and therefore improperly appealed to their passions rather than their impartial and objective judgment based on the evidence.

We conclude the prosecutor's arguments improperly appealed to the passions of the jurors by asking them to give justice to Bruins and her family. By so doing, the prosecutor, in effect, asked the jurors to consider the impact of the crime on Bruins's family. (Cf. *Vance*, *supra*, 188 Cal.App.4th at p. 1193.) In *People v. Medina* (1995) 11 Cal.4th 694, the California Supreme Court appeared to implicitly hold a prosecutor's argument that the jurors should "do justice" for the victim is an improper appeal to the jurors' passions. (*Id.* at p. 759.) Applying the California standard for prosecutorial misconduct, we conclude the prosecutor in this case used deceptive or reprehensible methods to attempt to persuade the jurors. (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 427.)

However, although we conclude the prosecutor's arguments referring to justice for Bruins and her family improperly appealed to the jurors' passions, we, like *Medina*, nevertheless conclude that error was harmless under California law. (*People v. Medina*, *supra*, 11 Cal.4th at p. 760.) Based on our review of the entire record in this case, we conclude there is no reasonable probability that the "prosecutor's brief and isolated comments could have influenced the jury's guilt determination." (*Ibid.*) The trial court instructed the jury with CALCRIM No. 220 on the reasonable doubt burden of proof and that it "must impartially compare and consider all the evidence that was received

18

throughout the entire trial." It also instructed the jury with CALCRIM No. 200, stating: "Do not let bias, sympathy, prejudice, or public opinion influence your decision," and if the attorneys' comments conflict with the court's instructions, "you must follow my instructions." We presume the jurors understood and followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Given those and other instructions and the overwhelming evidence, discussed above, supporting Wilson's guilt of first degree murder, we conclude there is no reasonable probability the prosecutor's brief arguments referring to justice for Bruins and her family could have influenced the jury's determination of Wilson's guilt. (*Medina*, at p. 760.) Alternatively stated, there is no reasonable probability the prosecutor's appeal to the jurors' sympathy or passions for Bruins or her family affected the verdict. (*People v. Fields, supra*, 35 Cal.3d at p. 363; *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250.) We conclude any prosecutorial error did not result in a miscarriage of justice. (*Bell, supra*, 49 Cal.3d at p. 535.) The prosecutor's error in so arguing was harmless under California law and does not require reversal of Wilson's conviction of first degree murder. *Vance* and the other cases cited by Wilson are factually inapposite and do not persuade us to reach a contrary conclusion.

Furthermore, to the extent Wilson asserts the prosecutor's arguments require reversal under the federal standard for prosecutorial misconduct, we disagree. Although we concluded above the prosecutor's arguments constituted misconduct under the California standard, we conclude that under the federal standard the prosecutor's brief and isolated comments regarding justice for Bruins and her family did *not* constitute a " 'a

19

pattern of conduct "so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis*, *supra*, 9 Cal.4th at p. 1214.)

## DISPOSITION

The judgment is affirmed.


                                                            McDONALD, J.

WE CONCUR:


HUFFMAN, Acting P. J.


IRION, J.